Approved: _Jennie E. Burns_____
JENNIFER E. BURNS
Assistant United States Attorney

ORIGINAL

DOC # ___/___

Before:    HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

# 14 MAG     1059

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :       **SEALED COMPLAINT**

          - v. -               :       Violation of
                                       18 U.S.C. §§ 1341, 1343, 1349
GRIGORIY SHINDER, and          :
ALBERT SHINDER,                        COUNTY OF OFFENSE:
                               :       NEW YORK
          Defendants.
                               :

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ROBERT HANRATTY, being duly sworn, deposes and states that
he is a Special Agent of the Federal Bureau of Investigation ("FBI"),
and charges as follows:

## COUNT ONE
(Mail and Wire Fraud Conspiracy)

        1.   From at least in or about 2007, through and including
in or about August 2010, in the Southern District of New York and
elsewhere, GRIGORIY SHINDER, and ALBERT SHINDER, the defendants, and
others known and unknown, unlawfully, willfully and knowingly
combined, conspired, confederated and agreed together and with each
other to commit mail fraud in violation of Title 18, United States
Code, Sections 1341, and 1343.

        2. It was a part and object of the conspiracy that GRIGORIY
SHINDER, and ALBERT SHINDER, the defendants, and others known and
unknown, having devised and intending to devise a scheme and artifice
to defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations and promises, for the
purpose of executing such scheme and artifice and attempting so to

1

do, would and did place in a post office and authorized depository
for mail matter, any matter or thing whatever to be sent and delivered
by a private and commercial interstate carrier, and take and receive
therefrom, such matter and thing, and knowingly caused to be
delivered by mail and such carrier according to the direction
thereon, and at the place at which it was directed to be delivered
by the person to whom it was addressed, any such matter and thing,
in violation of Title 18, United States Code, Section 1341.

3. It was further a part and an object of the conspiracy that
GRIGORIY SHINDER, and ALBERT SHINDER, the defendants, unlawfully,
willfully and knowingly, having devised and intending to devise a
scheme and artifice to defraud, and for obtaining money and property
by means of false and fraudulent pretenses, representations, and
promises, would and did transmit and cause to be transmitted by means
of wire, radio, and television communication in interstate or foreign
commerce, a writing, sign, signal, picture, and sound for the purpose
of executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

### Overt Acts

4.   In furtherance of the conspiracy and to effect the
illegal object thereof, the following overt acts, among others, were
committed in the Southern District of New York and elsewhere:

a.   In or about July 2007, a co-conspirator not
named as a defendant herein("CC-1"),[1] submitted a voucher to the
Administration for Children's Services ("ACS"), located in New York,
New York, seeking reimbursement for day care services that were not
in fact provided.

b.   In or about January 2008, CC-1 submitted a
voucher to the ACS, located in New York, New York, seeking
reimbursement for day care services that were not in fact provided.

c.   In or about March 2009, GRIGORIY SHINDER, and
ALBERT SHINDER, the defendants, deposited a check for approximately

---

[1] On or about May 30, 2012, CC-1 was convicted of bribery, in violation
of 18 U.S.C. § 666(a)(2), in connection with CC-1 making bribery
payments to New York City Department of Health and New York City Human
Resources Administration HRA employees to facilitate CC-1's scheme
to continue to receive fraudulent daycare subsidy payments at
Kingdomland and other daycare facilities.

$40,000 written by CC-1 to GRIGORIY SHINDER.  The $40,000 was a payment from CC-1 to GRIGORIY SHINDER and ALBERT SHINDER, for their investment in a fraudulent day care service.

(Title 18, United States Code, Sections 1341, 1343, and 1349).

## INVESTIGATION

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.      I am a Special Agent with the Federal Bureau of Investigation, and am currently assigned to a squad that investigates organized crime.  I have been a Special Agent for approximately four and a half years.  During that time, I have participated in numerous investigations of white collar crime, such as health care fraud, illegal gambling, wire fraud and mail fraud.  This affidavit is based upon my conversations with auditors and investigators employed by the New York City Department of Investigation ("DOI"), as well as other law enforcement officials, and my examination of pertinent records and reports.  As part of my training and experience, I have also conducted and participated in interviews of witnesses, the execution of search warrants, debriefings of informants, and I have reviewed recorded conversations and various business records and reports.

5. I have been involved personally in the investigation of this matter.  I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including interviews I have conducted, my examination of reports and records, and my conversations with other law enforcement officers and other individuals.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## The Day Care Subsidy Program

6.      According to DOI investigators familiar with the relevant federal and local child care programs, in an effort to help low-income parents obtain gainful employment, New York City administers a program to subsidize the day care costs incurred by low-income parents.  This day care subsidy program ("Day Care

3

Subsidy Program" or the "Program") is funded through a combination of local, state, and federal money.  Specifically, 67% of the Program is funded by the United States Department of Health and Human Services ("HHS"), which funds the Program in excess of $10,000 each calendar year.

7.    The New York City Human Resources Administration ("HRA") plays a critical role in the Day Care Subsidy Program for low-income families.  In the first instance, HRA determines whether families are eligible for public assistance and are engaged in approved work-related activity -- one of the central ways that a family can establish eligibility to participate in the Day Care Subsidy Program itself.  If HRA determines that a family meets these criteria, HRA then determines whether the family has satisfied the other requirements for participating in the Day Care Subsidy Program, requirements that include securing the services of a day care provider and submitting an enrollment form that identifies the provider and sets forth the weekly day care schedule for each child.

8.    The day care costs of eligible families are then subsidized through payments made directly to day care providers by the New York City Administration for Children's Services ("ACS"). For the day care centers involved in the schemes charged in this Complaint, including "Kingdomland," located at 7914 Bay Parkway, Brooklyn, New York 11214, and "Big Apple Day Care," located at 8207 Avenue L, Brooklyn, New York 11236.  The payment process works as follows: each month, ACS mails a form ACS-1, commonly referred to as a "voucher," from the ACS office in Manhattan to the day care provider.  This voucher lists all of the children receiving care from that provider pursuant to the Day Care Subsidy Program.  The provider then indicates on the voucher the number of days and/or hours of care provided to each child pursuant to the Program; the provider certifies that the information on the voucher is correct; and the provider submits the voucher to ACS.  Based on the information contained in these vouchers, ACS then directs a private company under contract with New York City to pay the day care centers.

### Regulation of Day Care Centers

9.    According to DOI investigators familiar with the relevant rules and regulations concerning day care centers, in New York City, day care centers may lawfully offer group day care for children only if (1) the centers have been approved by the New York City Department of Health ("DOH"); and (2) the centers abide by all the relevant DOH and New York City rules and regulations.

a.    In order to be approved by DOH, a group day care provider must, in the first instance, submit an application seeking a day care permit.   DOH then undertakes an initial, so-called "viability inspection" to determine whether the provider's space may appropriately be used as a day care center.

b.    Before being approved by DOH, the provider's space must undergo an inspection by the New York City Fire Department ("FDNY") to ensure that the space has adequate fire safety features. Before being approved by DOH, the day care provider must also produce proof that the physical space the provider intends to use has been issued a certificate of occupancy by the New York City Department of Buildings ("DOB") approving its use as a day care facility.

c.    Further, before being approved by DOH, the provider must demonstrate that its teachers are certified, and the provider's proposed staff must submit themselves to DOI, which fingerprints the prospective day care teachers and does criminal history checks.   A limited number of certain types of proposed day care staff submit themselves to fingerprinting at another New York City agency.

d.    Finally, before DOH approves a provider, DOH conducts a final inspection, during which, among other things, DOH inspectors measure the facility's physical space and determine whether the facility meets certain DOH requirements.   Among other things, DOH requires that each facility have 30 square feet per child and that certain teacher-child ratios be maintained.   These ratios vary depending on the children's ages.   For children 0 to 12 months old, the provider must maintain a ratio of one teacher for every four children; for children 12 to 24 months old, the ratio is one teacher for every five children; for children 24 to 36 months old, the ratio is one teacher for every 10 children; for children 4 years old, the ratio is one teacher for every 12 children; and for children 5 years old, the ratio is one teacher for every 15 children.

e.    After a facility is licensed by DOH as a day care provider, DOH performs "annual" inspections to ensure that the provider is continuing to meet DOH requirements.   DOH performs "additional" inspections as necessary in response to reports of violations of DOH requirements at any licensed providers.

Overview of the Criminal Schemes

10.   Based on my conversations with DOI investigators, I have learned the following:

11. GRIGORIY SHINDER and ALBERT SHINDER, the defendants, were part silent owners of a day care center known as "Kingdomland" located in Brooklyn, New York, operated by CC-1 and another co-conspirator not named herein ("CC-2").[2]

12.   From at least in or about 2007 through and including in or about August 2010, GRIGORIY SHINDER, and ALBERT SHINDER, the defendants, and other owners of day care centers in Brooklyn and Staten Island, New York (collectively known as the "Congregation"), engineered and/or participated in a scheme to defraud New York City through the day care centers they owned.   This scheme had a number of objectives.

a. First, GRIGORIY SHINDER, ALBERT SHINDER, and their co-conspirators defrauded New York City by requesting reimbursement for providing day care services to children who did not actually receive any such services.

b. Second, CC-1, with the knowledge of GRIGORIY SHINDER, ALBERT SHINDER, and other co-conspirators, made corrupt payments to HRA employees so that these employees would and did provide the names of eligible low-income children -- without the knowledge of the children or their parents -- so that the Congregation could request reimbursement for providing day care services to children who did not, in fact, receive any day care services.

c. Third, CC-1, with the knowledge of GRIGORIY SHINDER, ALBERT SHINDER, and other co-conspirators, made corrupt payments to DOH employees so that DOH employees would and did, among other things, (a) issue day care center permits to members of the Congregation even though the applications were incomplete and did not satisfy mandatory requirements and (b) ignore or downplay health and fire safety violations committed by members of the Congregation so that they

---

2 On or about January 12, 2012, CC-2 was convicted of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, in connection with the fraud occurring at Kingdomland and other daycare facilities.

6

could receive new or amended permits and/or avoid losing existing permits.

### The Congregation's Scheme to Defraud HRA and ACS in Connection with the Day Care Subsidy Program

13.  HRA records show that an HRA employee ("HRA Employee-1") deemed parents eligible to receive benefits under the Day Care Subsidy Program even though the parents had withdrawn their children from the Day Care Subsidy Program, or the parents' applications previously had been denied by another HRA employee.  In some of these cases, day care centers run by members of the Congregation, including Kingdomland, thereafter received payments from ACS for providing day care services for the children of these parents, even though the day care centers had not actually provided such services.

14.  For example, in or about June 2007, a parent ("Parent # 1") applied to receive benefits for two children in connection with the Day Care Subsidy Program.  The application was granted.  When interviewed by DOI investigators, Parent # 1 stated that for one week after Parent # 1's application for benefits was granted, in or about June 2007, Parent # 1's two children attended a day care center, not Kingdomland.  After one week, Parent # 1 stopped participating in the Day Care Subsidy Program and stopped sending the two children to day care.  Parent # 1 never sent Parent # 1's children to Kingdomland.

15.  However, ACS-1's were submitted on a monthly basis on behalf of Kingdomland, and certified by CC-1, from in or about July 2007 through in or about January 2008, seeking reimbursement for day care services provided to, among others, Parent # 1's two children.

16.  I have been informed by DOI investigators that HRA records show that between in or about June 2007 and in or about January 2008, HRA Employee-1 approved Parent # 1 for benefits under the Day Care Subsidy Program.  During that period, Kingdomland and another day care center received approximately $11,919 from ACS under the Day Care Subsidy Program in the names of Parent # 1's two children.

17.  I have reviewed a memo of an interview of CC-2.  On or about August 19, 2010, in an interview with DOI investigators,

7

CC-2 admitted that although Kingdomland lists approximately 100 children as attending Kingdomland and receiving day care services, in fact only approximately 60 children attend Kingdomland.

18.    I have reviewed memos of interviews of a cooperating witness ("CW-1"), an owner and operator of day care centers in Brooklyn, New York, and former member of the Congregation.[1] CW-1 said the following:

a.    GRIGORIY SHINDER, the defendant, was a silent partner in Kingdomland, and ALBERT SHINDER, the defendant, helped GRIGORIY SHINDER manage the affairs of Kingdomland and various other businesses.

b. GRIGORIY SHINDER invested over $1,000,000 in Kingdomland in cash which he provided to CC-1.  According to CW-1, CC-1 and CC-2 were responsible for the daily operations of Kingdomland, and GRIGORIY SHINDER and ALBERT SHINDER received commission payments from CC-1 from the proceeds of the fraud being conducted at Kingdomland.

c. Kingdomland had "phantom kids" listed as attending Kingdomland five-days a week, when the children were only present a few days a week, if at all.  To facilitate this fraud, both CC-1 and CW-1 made bribery payments to several HRA employees in furtherance of the Congregation's scheme.  GRIGORIY SHINDER and ALBERT SHINDER agreed that CC-1 should make these bribery payments.

d. In 2009, CW-1 spoke to GRIGORIY SHINDER concerning GRIGORIY SHINDER and ALBERT SHINDER's threats to CC-1 concerning CC-1's failure to make timely payments to GRIGORIY SHINDER from the fraudulent day care funds. GRIGORIY SHINDER threatened CC-1 that

---

[1]    CW-1 has pled guilty to mail fraud, in violation of Title 18, United States Code, Section 1341, conspiracy to commit mail fraud, in violation of Title 18, United States Code, Section 1349, bribery, in violation of Title 18, United States Code, Sections 666(a)(2), and conspiracy to commit bribery, in violation of Title 18, United States Code, Section 371, among other crimes, pursuant to a cooperation agreement with the Government and has provided information to the Government in the hopes of obtaining leniency at sentencing. CW-1 has provided accurate and reliable information in the past that has been corroborated by, among other things, witness interviews, documentary evidence, billing records, and phone records.

people would visit CC-1 if payment was not made. In approximately August 2009, CW-1 placed a call to GRIGORIY SHINDER from CC-1's office at Kingdomland questioning GRIGORIY SHINDER about threats made to CC-1.  In order to address these threats, CW-1 arranged and attended a meeting between GRIGORIY SHINDER, ALBERT SHINDER, CC-1, CC-2 and other co-conspirators.  At that meeting the scope of the fraud being conducted at Kingdomland was discussed. Also, during the meeting, GRIGORIY SHINDER demanded that CC-1 pay GRIGORIY SHINDER an additional $1,000,000 in commission from the fraud.

   e. After the meeting, CC-1 continued making payments to GRIGORIY SHINDER from the funds obtained through the Kingdomland fraud.

   19. From my review of bank records, I know the following:

   a. GRIGORIY SHINDER and a co-conspirator not named herein  ("CC-3") are the signatories on a Citibank checking account in the name of "Kingdom Land Corp." with an address of "7914 Bay Pkwy., Brooklyn, NY 11214," ending in 3225, ("Kingdomland Citibank Account-1").  Kingdomland Citibank Account-1 was opened on or about August 22, 2008.

   b. On or about February 6, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $11,500, signed by CC-1. The same day, that check was deposited in a Valley National Bank account, ending in 3217, held by GRIGORIY SHINDER and ALBERT SHINDER ("Valley National Account-1").

   c. On or about February 12, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $9,500, signed by CC-1. The same day, that check was deposited in Valley National Account-1.

   d. On or about February 19, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $10,000, signed by CC-1. The next day, that check was deposited in Valley National Account-1.

   e. On or about March 4, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $9,300, signed by CC-1. The next day, that check was deposited in Valley National Account-1.

f. On or about March 10, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $8,700, signed by CC-1. The same day, that check was deposited in Valley National Account-1.

g. On or about March 12, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $8,700, signed by CC-1. The same day, that check was deposited under the name "Albert Shinder" in Valley National Account-1.

h. On or about March 14, 2009, a cashier's check from CC-1, drawn from CC-1's Chase bank account ("CC-1 Chase Account-1") was written to GRIGORIY SHINDER, in the amount of approximately $40,000, signed by CC-1. Two days later, that check was deposited in Valley National Account-1.

i. On or about March 19, 2009, a cashier's check from CC-1, drawn from CC-1 Chase Account-1 was written to GRIGORIY SHINDER in the amount of approximately $9,300, signed by CC-1.  The next day, that check was deposited into Valley National Account-1.

j. On or about April 22, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $8,700, signed by CC-1.  That day the check was deposited into Valley National Account-1.

k. On or about April 27, 2009, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $8,300, signed by CC-1.  That day the check was deposited into Valley National Account-1.

l. On or about January 27, 2010, two checks were written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $8,000, and $6,000, signed by CC-1.

m. On or about March 11, 2010, three checks were written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $8,000, $7,000, and $6,000, signed by CC-1.

n. On or about June 1, 2010, a check was written from Kingdomland Citibank Account-1 to GRIGORIY SHINDER, in the amount of approximately $14,000, signed by CC-3.  The next day the check was deposited into Valley National Account-1.

20.     I have reviewed memos of interviews of a confidential source ("CS-1").[2] CS-1 stated the following:

a. CC-1, GRIGORIY SHINDER, the defendant, and others were part owners of Kingdomland and Big Apple Day Care.

b. CC-1 informed GRIGORIY SHINDER that both Kingdomland and Big Apple Day Care had "phantom children" who were listed as attending the day cares but never actually did. CC-1 also informed GRIGORIY SHINDER that CC-1 provided government officials to facilitate the fraud.

c. GRIGORIY SHINDER and others would solicit low income families for the personal identifying information of their children in order to supply that child's information to the State of New York stating that the low income child attended one of the day cares listed above, when the child did not actually attend the day care.

d. CC-1 informed CS-1 that CC-1 made approximately $600,000 in profits from fraudulent day care centers over the course of approximately 6 months.

---

[2]   CS-1 is an individual who is in a position to testify.   CS-1 has provided reliable information which has been corroborated by other witness testimony, bank records, and documentary evidence.

      e. CC-1 told CS-1 that GRIGORIY SHINDER demanded that CC-1 continue to make payments to GRIGORY SHINDER from the fraudulent day cares even after they ceased to be profitable.

      WHEREFORE, deponent prays that an arrest warrant be issued for GRIGORIY SHINDER, and ALBERT SHINDER, the above-named defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

                        ROBERT HANRATTY
                        Special Agent
                        Federal Bureau of Investigation

Sworn to before me this
15th day of May, 2014

HON. DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK